Margaret KILPATRICK and Susan Crull (Assignee and Successor in Interest of Helen Sears), Appellants,

v.

The ESTATE OF Oneta A. HARRIS, Nettie Ruth Hoskins, Independent Executrix of the Estates of Oneta A. Harris, Deceased and Earl Bancroft Harris, Deceased and Nettie Ruth Hoskins, Individually, Appellees.

No. 13–91–491–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 18, 1993.

Rehearing Overruled March 18, 1993.

Richard B. Stone, Law Offices of Stone & Stone, Corpus Christi, for appellants.

M.W. Meredith, Jr., Caroline L. Bertuzzi, Meredith, Donnell & Abernethy, Corpus Christi, for appellees.

Before NYE, C.J., and KENNEDY and GILBERTO HINOJOSA, JJ.

## OPINION

NYE, Chief Justice.

Appellants Margaret Kilpatrick and Hel-

en Sears,[1] sisters of Earl Harris, appeal from a judgment imposing a constructive trust upon Oneta Harris's estate. Appellants claim that the trial court erred by imposing a constructive trust on Oneta Harris's estate and ordering that the assets of Oneta's and Earl's estates be distributed according to the constructive trust. We affirm the trial court's judgment.

Earl and Oneta Harris were husband and wife. They lived in Robstown, Texas. They had no natural or adopted children. Earl and Oneta ran their own asphalt paving business and an oilfield service business. Together, Earl and Oneta amassed an estate of almost one million dollars. In October of 1974, Earl executed his will. Oneta wrote a virtually identical document which was signed and witnessed two days after Earl's.[2] Two of the witnesses to Earl's will also witnessed Oneta's. Although each made a separate instrument, the provisions of the two were virtually identical. Earl's will provided that if he died first, he gave Oneta a life estate in all of his property, with the remainder to be divided equally between appellants. Oneta's will mirrored Earl's, except that she devised the residue of her estate to her relatives in unequal portions.[3]

Earl died on August 23, 1984. At the time of his death, his will was not found, and his property passed to Oneta by intestate succession. Under independent administration, all of Earl's assets were transferred to Oneta. They still remain in Oneta's estate.

Oneta Harris died on September 15, 1985, leaving a will dated September 27, 1984. An independent administration was opened on October 8, 1985, naming Nettie Ruth Hoskins as the Independent Executrix of Oneta Harris's estate. Hoskins was the Harrises' accountant and a long-time friend. Hoskins administered Oneta's estate according to the provisions of her 1984 will. Estate taxes were paid on the value of Oneta's total estate—almost one million dollars.

In September of 1986, Hoskins found Earl's 1974 will among the Harrises' papers. Earl's will was then admitted to probate on January 22, 1987. The court subsequently ordered the causes on the two estates to be consolidated and issued letters testamentary naming Nettie Ruth Hoskins the independent executrix for Earl's estate. Thereafter, appellants filed a petition requesting an accounting, distribution, and removal of the independent executrix (or to require her to post bond). They also requested that the affidavit of intestacy on Earl's estate be set aside and that his estate be probated according to his will. They argued that the distribution of the assets according to Oneta's will was not in accordance with Earl's wishes and had given Oneta's legatees a disproportionate share of the assets.

Hoskins claimed that Earl and Oneta had contractual wills. The parties tried and

1. Mrs. Sears is now deceased and her interest in the lawsuit has been assigned to her only child, Susan Crull.

2. Although Oneta's 1974 will was signed, dated, and apparently witnessed, the executrix Hoskins never conclusively established that it was executed. At no time did Hoskins ever attempt to prove execution or to probate Oneta's 1974 will.

3. Paragraph 4 of Earl's will provided that if Oneta predeceased him, he devised one-half of his property to his sisters, to be divided equally. The other one-half of the property he devised to Oneta's relatives in the following percentages: 33% to Hoyt Wilkerson, 33% to Beth Marie Manning, 17% to Gertrude Coffman, and 17% to Arthur Ralph Tucker.

The corresponding portion of Oneta's 1974 will mirrored Earl's. It provided that if he predeceased her, she devised one-half of her property to appellants, to be divided equally. The other half she devised to her family as follows: 33% to Hoyt Wilkerson, 33% to Beth Marie Manning, 17% to Gertrude Coffman, and 17% to Arthur Ralph Tucker.

It appears from the plain language of paragraph 4 that neither of the wills actually affect a 50-50 disposition of the entire estate if the testator died last. However, the paragraph 4 language never became effective in either will. Earl died first, making the life estate provision of his will effective. Oneta executed a different will in 1984, thereby revoking her 1974 will. Appellants do not complain on appeal of the admission of the wills as evidence corroborating an agreement between Earl and Oneta to divide their estate equally between their two families.

submitted this issue to a jury. The jury found that:

Earl and Oneta entered into an agreement between themselves that each of them would make a will whereby the survivor would have the use of all of the property of both of them during the survivor's life, and then the remaining property would pass one-half to Earl's selected relatives and friends and one-half to Oneta's selected relatives and friends.

By point two, appellants complain that the trial court erred by imposing a constructive trust upon Oneta's estate and in ordering the distribution of the properties of both estates in a manner that ignores both parties' wills. The trial court entered judgment based upon the jury's findings that Earl and Oneta entered into the agreement, that Earl executed his 1974 will pursuant to that agreement, and that Oneta's 1984 will breached their agreement. Appellants claim there is no evidence or insufficient evidence to uphold the jury's answers to these questions.

In reviewing no evidence points, we must consider only the evidence and reasonable inferences tending to support the jury's findings and disregard all evidence and inferences to the contrary. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). If there is any evidence of probative force to support the jury's findings, the "no evidence" point must be overruled. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). When reviewing insufficient evidence points, we must consider and weigh all the evidence. The jury findings will be upheld unless the evidence to support a finding is so weak that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).[4]

First, appellants attack the finding of an agreement and argue that the "agreement" found by the jury is not an enforceable contract because there is no evidence showing a meeting of the minds, no comprehensive plan for the distribution of the estates, and no definite designation of beneficiaries or gifts. One who contends that mutual wills are contractual as well as testamentary in character has the burden to prove that the wills are contractual and resulted from a mutual agreement by both parties. *Kastrin v. Janke*, 432 S.W.2d 539, 540 (Tex.Civ.App.—El Paso 1968, writ ref'd n.r.e.). Usually, such proof includes a showing that the wills are mutual, irrevocable and resulted from a prior agreement whereby each party agreed to execute the will in question in return for the execution of a will satisfactory to him by the other party. *Kastrin*, 432 S.W.2d at 540.[5] The agreement must be definite, defined, or certain in all of its parts. *Magids v. American Title Ins. Co.*, 473 S.W.2d 460, 465 (Tex.1971). Proof that a will is contractual may be made by provisions of the will itself or by competent witnesses who testify of the agreement. Evidence of declarations of the promisor, relations or conduct of the parties and other facts and circumstances that tend to prove that an agreement was made, are admissible. *Knesek v. Witte*, 754 S.W.2d 814, 817 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

An examination of Earl's 1974 will and Oneta's two wills reveals no language which indicates that the wills are contractual or mutual. Therefore, we must examine the record to determine whether there is any extrinsic evidence showing a meeting of the minds and a definite designation of beneficiaries and gifts.

Hoskins presented her own testimony and that of Bob Payne and Jacque Hefte. Hoskins testified that she talked to Earl "at length" about what "they were doing with their estate plan," that is, why they

---

4. Appellants also claim that the jury findings are against the overwhelming weight and preponderance of the evidence. Such a claim is used by the appellant when attacking an adverse finding upon which he had the burden of proof. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275–76 (Tex.App.—Amaril-

lo 1988, writ denied); Hall. *Standards of Appellate Review*, 21 St. Mary's L.J. 865, 909 (1990).

5. The issues of proof of consideration and irrevocability are not before us. *See Kastrin*, 432 S.W.2d at 540. Therefore, we do not address them.

had prepared their 1974 wills the way they had. Hoskins testified that she had several meetings with Earl and Oneta. Although Hoskins knew of their 1974 wills and the agreement between them, she testified that she eye-witnessed only one meeting with *both* Earl and Oneta. That particular meeting took place "long after the '74 wills had been signed." At that time, the Harrises agreed on a change to Oneta's will regarding one of her heirs, but there was no change in their agreement that fifty percent of the total estate would go to each of their respective sides of the family. Hoskins stated that the change was made to both Earl's and Oneta's wills. Hoskins stated that when the meeting she attended took place, the Harrises were planning to make new wills which would leave the first decedent's property to the other "outright," with no distribution until after the last one died. The new wills were never made. Nevertheless, Hoskins' testimony established that at all times the agreement was to divide the estate evenly.

Bob Payne, Earl's business partner, testified that on one or two occasions Earl told Payne his plans for dividing his and his wife's estate. That plan was to divide it evenly between their families. Payne also told the jury about a conversation he had with Oneta after Earl's death. He stated:

she and Earl had always said they were going to divide their estate between their families and that she had to change her will because Earl had always been very generous with her family, and she wanted to make sure that half of her estate went to his sisters.

At that time, Oneta possessed 100% of Earl's estate through the laws of intestacy because Earl's will had not been found. Payne stated that he understood that their agreement was to "divide everything equal." He further explained that, while Earl was a very private person and did not discuss the matter very deeply, Oneta discussed their agreement with him in detail.

Jacque Hefte, a close friend of the Harrises, testified that Earl and Oneta discussed the disposition of their estate with her "many times." She stated that "they wanted the property split right down the middle.... Earl wanted his sisters to get his half and Oneta's relatives her half." She did not recall any provision for the survivor to have all the property up until his or her death. Hefte said that Earl and Oneta made these statements to her in each other's presence many times. After Earl's death, Oneta was very determined to comply with Earl's wishes, which were that Oneta's family was to have one-half and Earl's sisters the other half.

The Harrises' 1974 wills were entered as evidence corroborating their agreement. Hoskins also introduced documents showing that in 1980 through 1983 Earl made gifts of 125 shares of stock to Helen Sears, his sister, and to Oneta's sister, Gertrude Coffman. The Harrises had received the stock as consideration from the sale of their business. Oneta continued the pattern of giving equal gifts to both her and Earl's relatives by giving $10,000 to each side of the family in 1985. Again in 1985, Oneta gave $1,500 to her sister, Gertrude Coffman, and $1,500 to Earl's sister, Helen Sears. The foregoing evidence constitutes more than a scintilla and supports the jury's finding that Earl and Oneta agreed to make wills giving a life estate to the survivor and then to divide their estate evenly between their relatives.

Contrary to appellants' contention, the trial court did not "make up" amounts or beneficiaries. The wills themselves show the percentages of the gifts to be made to each family member. We disagree with appellants' claim that the essential terms of the agreement were too indefinite to be enforced and that there was a fatal lack of a clear plan of distribution. The jury found that the agreement alleged did exist. Earl's 1974 will and Oneta's 1984 probated will made it clear who the couple's intended beneficiaries were. Once the jury found an agreement to split the estate evenly, the beneficiaries were plain from the wills before the court. We do not find the terms of the agreement to have been too vague and indefinite to preclude enforcement. The evidence is not so weak that the jury's

finding is clearly wrong or manifestly unjust.

■ Appellants argue alternatively that Oneta's 1984 will did not breach the agreement because Kilpatrick and Sears were also Oneta's "friends and relatives," and the agreement allowed Oneta to designate whomever she wished as beneficiaries. The jury found that the effect of Oneta's 1984 will is to distribute 75% of the total estate to Kilpatrick and Crull and 25% to relatives and friends designated by Oneta. The effect of her 1984 will is contrary to the Harrises' agreement that each side of the family receive fifty percent only of the total estate. That Oneta's relatives would receive fifty percent of the estate was as much a part of Earl's bargain as was the term that his relatives would receive fifty percent. The evidence is sufficient to support the jury's findings.

■ Next, appellants argue that the critical question in this case, whether Oneta's 1984 will breached the contractual agreement *made in 1974,* was omitted from the charge. They objected to the omission of this issue and tendered it in writing to the court. *See Wright Way Construction v. Harlingen Mall Co.,* 799 S.W.2d 415, 418–19 (Tex.App.—Corpus Christi 1990, writ denied); *see* TEX.R.CIV.P. 278. We find no error in the court's charge. By their answer to question 1, the jury found that Earl and Oneta *had entered into the agreement on or around 1974.* Hoskins' question 3 asks if Oneta breached the agreement "if the effect of her will is to distribute the total estate of Earl and Oneta Harris 75% to those designated by Earl and 25% to those designated by Oneta." We believe the charge is clear. As appellants have pointed out, only Oneta's 1984 will was proven to have been executed, probated, and therefore effective. While we agree with appellants that there was some evidence of another agreement between Earl and Oneta around 1984 concerning their plan to execute new wills to affect a different distribution of property to the surviving spouse, the evidence showed that those wills were never made. The case was tried and submitted on the theory of the 1974

agreement and the ensuing execution of Earl's will. The jury was asked if Earl and Oneta had entered an agreement "on or before October 7, 1974." Next, the jury was asked if Earl executed his will pursuant to this agreement. The jury found that he did. Finally, the jury was asked if Oneta failed to carry out the agreement "if the effect of her will was to distribute the total estate of Earl and Oneta Harris 75% to those designated by Earl and 25% to those designated by Oneta." The jury found that she did breach the agreement.

Finally, appellants complain that Earl and Oneta's agreement was not in writing. Earl's will was executed in 1974. At that time, nothing in the law required wills to expressly recite the existence of a contract. TEX.PROB.CODE ANN. § 59A (Vernon 1980), (effective only upon wills executed after Sept. 1, 1979), requiring the wills to expressly state that a contract exists. *Wiemers v. Wiemers,* 683 S.W.2d 355, 356 (Tex. 1984).

■ Similarly, appellants argue that the Harrises' oral agreement violates the statute of frauds. An oral agreement to make mutual wills can be taken out of the statute of frauds by partial performance. *Kastrin,* 432 S.W.2d at 541. Such partial performance occurs when the first party to the agreement dies, having performed his obligation, and the survivor benefits from that performance. Although she initially did not take under the will, Oneta benefitted from Earl's performance of the obligation when he made his will pursuant to their agreement. When his will was finally probated, Oneta's estate received an estate tax refund. Thus, Oneta benefitted from Earl's performance, and the agreement does not fall within the strict confines of the statute of frauds.

In addition, both Earl and Oneta performed acts in partial compliance with their agreement. In the years 1980–1983, Earl delivered equal gifts of stock to his and Oneta's relatives, in accordance with their agreement to divide the estate. After Earl's death, Oneta also made equal cash gifts to both her own and Earl's relatives.

Further, Oneta made her 1984 will with the mistaken belief that Earl had no will and her new will was the only way to comply with their agreement. Absent some showing of fraud or undue influence, the testator's mistake of law or fact will not invalidate her will, even if she would have made a different will had she known the true facts. *Carpenter v. Tinney*, 420 S.W.2d 241, 244 (Tex.Civ.App.—Austin 1967, no writ). To probate Earl's will and then to probate Oneta's 1984 will according to its strict language, without reference to their agreement, which precipitated the making of the wills, would amount to a fraud on both estates. The law will enforce contractual wills because it would be manifestly unjust to permit the surviving party to the contract to disavow it and its obligations, as those obligations are incorporated in the will, after the other party has fully performed by abiding by it until his ability to revise it has been terminated by death. *Novak v. Stevens*, 596 S.W.2d 848, 852 (Tex.1980). As stated before, the agreement that Oneta's relatives would receive fifty percent of the estate was as much a part of the bargain as the term that Earl's relatives would receive fifty percent.

Finally, appellants complain that Hoskins was barred by limitations from asserting the Harrises' contractual agreement. Appellants correctly state the law in Texas, that in a case involving a constructive trust, the statute of limitations does not begin to run until the beneficiary knew or should have known that he had a cause of action. *See Knesek*, 754 S.W.2d at 815. Appellants argue that Hoskins should have known that she had a contractual wills claim in September of 1986 when she discovered Earl's will, since she knew the provisions of both wills. Yet she did not file her answer alleging contractual wills until September 6, 1989, more than two years later. We disagree with appellants' argument. Hoskins's defense of contractual wills merely adds additional facts and asserts additional defenses to the cause of action appellants filed against her. It does not arise out of a transaction or occurrence which is new or different from appellant's cause of action. Therefore, her September 6, 1989 amended answer in which she alleged contractual wills for the first time relates back to the filing of her original answer, on July 25, 1988. Such date was within two years of the earliest date from which the contractual wills claim could have accrued, that is, September of 1986 when Earl's will was found. *See Knesek*, 754 S.W.2d at 816; Tex.Civ.Prac. & Rem.Code Ann. § 16.068 (Vernon 1986); *see also Weidner v. Crowther*, 291 S.W.2d 472, 477 (Tex.Civ.App.—Austin 1956), *aff'd*, 157 Tex. 240, 301 S.W.2d 621 (1957). We find no error. Point two is overruled.

By their first point of error, appellants claim that the trial court erred in ordering distribution of Earl's estate in a manner contrary to his will. Earl gave Oneta a life estate in all of his property. After his death, all of the assets of Earl's estate were transferred into Oneta's. Earl's will provided that, when Oneta died, the residue of his estate would be divided equally between his sisters. The trial court's disposition of 25% each, of the total estates of Earl and Oneta Harris, to Helen and Margaret, is in accordance with Earl's desire that all of his one-half share of the estate go to appellants. We see no error in the trial court's disposition.

Appellants wish the trial court to transfer Earl's assets back to his separate estate and to have the estate administration reopened. Appellants claim that the trial court's failure to do so deprives them of their right to have Earl's will probated under sections 37 and 83 of the Probate Code. *See* Tex.Prob.Code Ann. §§ 37, 83 (Vernon 1980). Section 83(c) of the Probate Code provides:

Whenever letters of administration shall have been granted upon an estate, and it shall afterwards be discovered that the deceased left a lawful will, such will may be proved in the manner provided for the proof of wills. All acts done by the first administrator prior to the qualification of the executor or of the administrator with the will annexed, shall be as valid as if no such will had been discovered. Tex. Prob.Code Ann. § 83(c) (Vernon 1980).

We believe that the trial court's order for distribution of Earl's estate is in harmony with his will and with the provisions of the Probate Code. Appellants concede that § 83 validates acts of the intestate administrator, but they argue that, when a valid will is later found, the administrator's acts are voidable and may be set aside by the court. Appellants further complain that the court's order closing Earl's estate was error because it was filed by Hoskins, who at that time was not executrix of Earl's estate.

We note that appellants state that certain transfers of property have already been made, at the agreement of all parties. While asking this Court to set aside the administrator's acts and separate Earl's assets, they somewhat inconsistently request that these distributions not be disturbed. The trial court has ordered distribution of the assets of the estates to appellants in percentages commensurate with the devise in Earl's will. Texas Rule of Appellate Procedure 81(b)(1) states:

> no judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has committed an error of law in the course of the trial, unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case.

The trial court did not ignore the distribution scheme of Earl's will. Rather, it distributed Earl's estate to his family as he directed. We find no reversible error. Point one is overruled.

The judgment of the trial court is AFFIRMED.